5, 7, 14, United States v. Reynolds. Mr. Spears, we're going to wait just one minute. Yes, there's traffic in the back. May it please the Court, Brian Spears and Spears, Manning, and Martini for the defendant appellant, Kimond Reynolds. As the Court is aware, this case is about the sufficiency of the evidence of a criminal conspiracy to distribute narcotics. I want to focus this morning specifically on the element of knowledge. The government was required to prove that Mr. Reynolds knew he was involved in a conspiracy, the object of which was the distribution of narcotics. That's what he was charged with. The government failed to prove that. There was no evidence. Your client took the stand. Yes, Your Honor. And one can assume that the jury inferred that he was lying, and that the reason he was lying was because he was involved in the very charge that was made against him. There's a lot more here, but why isn't that, if not enough, at least a strong indication that it was this very charge that he was seeking to avoid? Your Honor, my client taking the stand is certainly a factor. He was convicted, so the assumption is that the jury didn't believe everything that he said. They apparently did believe that he did not have any awareness or possession of the drugs that were found in the car. They apparently did not believe that he was not part of an agreement to distribute narcotics. That's only one factor. I mean, I would concede that that is a factor that the court can consider, but it's not dispositive. And what's ultimately missing here is any linkage between my client and the drugs that were found in the car. As the court is aware, they were secreted in the dashboard. My client was the third person in the car sitting in the back. There's no connection between him and those narcotics. I guess the question, just to follow up, is why isn't it enough circumstantial evidence that a jury would find Mr. Reynolds was lying about the question, did you know there were drugs in the car or did you know the other guys in the car? And the answer to that, those questions, is if he were lying to cover up what he was being asked, the true answer to what was being asked. Does that make sense? It does, Your Honor. So that would be evidence of consciousness of guilt. But we can't separate the fact that the jury did believe the testimony that he didn't know that the drugs were in the car because they acquitted him of possession of those drugs. So the question comes down to the conspiracy charge and what my client's knowledge was as to the object of the conspiracy. No question, Your Honor. And there are multiple cases that say you could be convicted of conspiracy and acquitted of possession. I understand that. But in terms of thinking about my client's testimony, it's fair to assume that the jury credited or certainly didn't disagree with him when he said he was not aware of the drugs in the car. But I think, to your point, Your Honor, one of the things about this case is that the nothing that happened in that car. So it is true that you can have a conspiracy conviction when there's an acquittal for possession. But the essence of this case was, from the government standpoint, is that these three people were in a car that contained drugs in a secret compartment and that they were conspiring to distribute those drugs. So where you have such a close connection between the conspiracy and the possession, it is significant in our view. It's certainly consistent with our theory that the jury acquitted my client of possession. And our theory with respect to the knowledge component is that he didn't know that the drugs were in the car. And there is, we have the benefit of a nicely developed body of case law from this circuit, most recent of which was decided in January, the United States versus Pelosi case, where this court emphasized, even if you have a conspiracy and it appears that the defendant knew that he was involved in illegal activity, if he didn't know that that conspiracy involved the distribution of drugs, that it was a narcotics conspiracy, then that's insufficient. What was the explanation for the jail call where Mr. Reynolds said, too many people didn't want me to get money? Yes, Your Honor. So Mr. Reynolds testified that that was in reference to, part of that same call is he said, there must be haters out there. People don't want me to get money. He was complaining about people who had ratted and snitched. Were those separate calls? There are a series of calls that involve, you're right, Your Honor, reference to snitch, ratting. But in the one call where he says, there must be haters that don't want me to get money. His testimony on that, which was certainly plausible, and I respect that the jury may have discredited it, but his testimony on that was that that was in connection with the fact that he had just gotten a job at UPS. He didn't testify about that, and then he was working as a security guard, too. Yeah, but we have to take everything most favorably to the government here, and certainly a more likely alternative is that the jury thought that was a total baloney explanation and made no sense, and that in these calls he was repeatedly confirming his involvement in a conspiracy. Well, respectfully, Your Honor, he wasn't confirming anything other than... There's no... He says he was in the calls that someone had snitched on him, that he was only minutes from his destination, that he... Got myself in this. Yes, thank you very much. So he gets on the stand, and he says, oh, you know, this had to do with other things and all like that. And why isn't it perfectly reasonable for the jury to say, you've got to be kidding. This just confirms that you're trying to put this unlikely slant on these statements that you knew exactly what was going on. Well, it's similar to the defendant in Biloysi who was asked by law enforcement... Yeah, but he didn't take the stand. He didn't take the stand, but it was an exculpatory statement that said, I was just in the plane to get a bag of chips and get some food instead of really what he was doing. Yeah, but we're talking about... He goes before the jury. He gives explanations that I think a jury quite reasonably could say are ridiculous. They were also inconsistent with statements he had made earlier. And that's a totally different situation from Biloysi, it seems to me, because we're now... Because your attack is on the sufficiency of the evidence that was presented to the jury. Right, but even if we accept that those are false exculpatory statements, there still had to be some evidence linking him to the drugs. He was in the car with them. But that's really... That is some evidence of it. It doesn't compel that conclusion. But beyond that, what is the most likely meaning of the interpretation if somebody says, the reason I've been arrested and charged is that somebody snitched on me? What does that communicate? It communicates that he was trying to figure out how he ended up being arrested. What does he say? He snitched on me. What did the person say who snitched on me to get me arrested? What did that person say? Of course we don't know, but that person could have... That snitch could have said, there's a car with three people in it, you should pull it over. And that wouldn't... We don't know. We can't... That's not anything beyond speculation. And I would agree. If you accept... I can accept for purposes of argument that his testimony was hard to follow and at times not credible. Let's accept that. At the end of the day, the government has to have some evidence linking my client to the drugs and respectfully, just being in the backseat of a car where drugs are secreted in the dashboard and where the jury acquitted him of possession of those drugs, that evidence was insufficient. I see my time's up. Thank you, Counselor. You have a couple minutes for rebuttal. May it please the Court. My name is Stephen Clymer. I represent the United States. If time permits, I'd like to address two topics. First, Reynolds' own words and conduct that show his knowing involvement in a conspiracy to distribute drugs. And second, I'd like to explain why Defense Counsel's reliance on reply briefs on the Pelosi cases was pledged. As the Court's aware from the record here, Mr. Reynolds gets into a Jeep Cherokee in Brooklyn and leaves with two other men bound for the North Country around 1.30 in the morning on Wednesday, November 2023. Inside the car secreted in a hidden compartment, there's distribution quantities of drugs. There's methamphetamine, there's cocaine, there's cocaine base, there's heroin, and there's fentanyl, all in this hidden compartment. Now, we'll readily concede that there's no evidence that Mr. Reynolds put the drugs in there, no fingerprints, no DNA evidence. Nobody saw him do it. He didn't admit doing it. And there's no evidence that he knew exactly where in the car the drugs were or ever saw them in that compartment. That doesn't mean, however, and I disagree with counsel on this, that he wasn't aware that they were transporting drugs to the North Country because the rest of the record shows that he was well aware because that was the plan to take drugs to the North Country and distribute them once they got there. But what's the evidence of that being the plan? A number of things, Your Honor. First of all, there's the stop at Wal-Mart on the way up to the North Country where they purchase clothing, toiletries, and food. That conduct is consistent with two things that are significant. One, it's consistent with expert testimony in the case that there are these people called plucks, and the modus operandi of a pluck is to buy drugs in bulk in urban areas where it's cheaper, transport the drugs up to the North Country, sparsely populated areas, stay in the home of a local resident who has ties to drug users in that community, namely potential customers, and over a period of days or a week sell the drugs that were purchased cheaply in small user quantities to people up north for a high profit. So does it follow from that, I found the expert's testimony odd. Does it follow from that that every time someone gets into a vehicle and goes to the North Country and stops at Wal-Mart to get some clothing and food that they are a pluck? No, Your Honor, it certainly does not mean that. So I don't understand what the expert added, if anything, to your evidence. Your evidence may be sufficient, but I'm not sure that his testimony added anything. Well, I think what it added, Your Honor, is not to say that that conduct at Wal-Mart proved the case, but it was certainly consistent with the conduct of these people called plucks. And it's also consistent with someone planning on a drive to your wonderful part of the state and desiring to stay for a while. Absolutely, Your Honor, but there's a second piece of evidence I'd like to mention. Do all vacationers in the Adirondacks, should they all be arrested as plucks based on that testimony? Absolutely not, Your Honor, and that, of course, didn't happen here. But there's a second piece of evidence there, which is in one of the jail calls, and I believe you mentioned it to defense counsel. Mr. Reynolds begins to complain about the fact that he was concerned about the Wal-Mart stop and the purchases because he knew the modus operandi of plucks as well as the expert did. He asked a couple of rhetorical questions. You know, who goes in and buys this stuff? The police are watching the stuff. They probably followed us from Wal-Mart. So he was sufficiently knowledgeable about what was going on that he understood. I agree that that's evidence. I just don't think the expert's evidence added anything to that. I think maybe it illuminated the significance of that jail call, Your Honor. I'll suggest that it did that at least. There was more here, though, with respect to his conduct. You recall the defendant testified that before they even got to Plattsburgh, around dawn after leaving in the middle of the night or early morning hours, he claimed that they stopped and that there was a fourth person in the car, this person who he identified as his friend, Ty. He said it's the only person in the car he knew, and he claims that out in the middle of nowhere somewhere between Saratoga and Plattsburgh, according to the cell site data that the government introduced in the case, this person, Ty, just gets out and walks away. He doesn't say where he goes, what he was doing, just walks away. And the defendant then says, I expected to be stopped off at a bus station. That's how I was going to get home. Now, later he says he had no money, so that raises the question, how was he going to buy a bus ticket? But he says that. The other thing that's significant is when they're in Plattsburgh, one of the only two cities in the North Country, the other being Ogdensburg, they don't go to a bus station. He doesn't go to a bus stop. Stays in the car. He's still in the car around past noon when they finally get them alone and the police stop them. When the police stop them, all three of their occupants in the car at this time give the police different responses to the same questions. Mr. Reynolds says, I don't know where we're going. And, of course, doesn't say anything about bus station because that, of course, was a made-up story during his trial testimony. The officers then find $1,000 in the car, and ultimately they find the drugs. As the court's aware, then we get to the jail calls, and I look at the jail calls as falling into at least four categories, all of which are incriminating. First, when complained to, his girlfriend and his brother, Mr. Reynolds, talks about the fact that they got there late and that they were only minutes from the destination when they got stopped. So he knew when they were supposed to get there. He knew what their destination was when they got there. That is evidence of planning, which is another way of saying it's an evidence of an agreement, which is another way. It's knowledgeable. He's knowledgeable about the fact that there's a conspiracy. He knows what the plan is. How is that evidence of an agreement, again? Because he wasn't driving the car. A man named Franklin was driving the car. Franklin had to know where they were going because he was driving there. The defendant also knew where they were going because he knew they were only minutes away when they stopped. So there must have been some joint agreement that they were going to a particular destination and they were supposed to get there at a certain time. That's a good, attenuated bit. Okay, I guess what's the other evidence from the jail calls that would go to an agreement? As the court has asked about, the references that someone snitched on us, someone ratted me out, those certainly are indicative that somebody with knowledge of what the defendant was going to do contacted police and told police about it. That's what snitched means. Judge LaValle asked that question a couple times. It wasn't answered. That's the answer. That's what the word snitched means. Somebody with knowledge of my criminal conduct told police about me, and that's why I got arrested. He says that repeatedly. And if it's circumstantial evidence of general criminality, is that good enough for conspiracy? Is that sufficient? Well, I know there's the claim that the Belosi case applies here and that we don't know what the contraband was, but this case is far different than Belosi for a number of reasons. First of all, that was an importation case. There's many sorts of contraband one can bring in the country and commit a crime. This was a distribution case. The other significant thing here was this was a case where the plan was to spend multiple days together in a sparsely populated area and distribute drugs. The jury could reasonably ask itself, what in the world would Reynolds be doing with these two people he claims he doesn't even know going up to the north country with no way of getting home with implements, clothing, toiletries, and food for a multi-day stay? If they're going to distribute drugs up there, and they clearly had enough drugs to distribute for some time up there, if they were going to do that, why in the world would he be with them if he wasn't involved in that conspiracy? What drug dealer would bring someone they don't know along for a multi-day trip to sit in a house somewhere in the north country and sell drugs? He doesn't also say in the phone, he not only says, as was mentioned, that someone snitched on him, he says someone ratted him out. That's a direct reference to the charge that he's being charged with, right? I agree, Your Honor. And finally, he also essentially accepts responsibility. He also says, you know, I effed up, I wrecked my life. He realizes he's done something wrong that's got him in this situation, and he's talking to either his brother or his girlfriend at that time, and he takes responsibility for what he's done in the position that he's put himself in. Unless the court has further questions, I'll simply ask that the court affirm a reasonable jury clearly could convict on the evidence in this case. Thank you. We'll hear rebuttal. Thank you, Your Honors. I think what we just heard was a troubling level of speculation, trying to interpret innuendo, vague references, and piling it all together and saying he must be guilty because he was in the car. That's essentially what's going on here. No, no, no, no, no, no. It's not just because he was in the car. We've been talking for the last ten minutes about a lot more than just being in a car. Like saying, I've been charged with this crime. I think that somebody must have ratted me out. Somebody must have told on me. I got myself into this. I don't know what I was thinking. It's not just being in the car. You can't make that argument. But beyond being in the car, we're left to, in my opinion, speculate about what the snitch means. I think you're saying quite properly that each of these different things that he said, each of these things could be consistent with an instant explanation or a different explanation. But they also could easily be the – we are required at this stage to interpret ambiguous evidence in a manner favorable to the government. And while it's absolutely correct that they didn't necessarily mean that he was guilty of the crime, they gave strong indications of it. But as we stand here today, and I don't think the government could even answer this question, what was Mr. Reynolds going to be doing? What was his role? What was the plan for him? We don't know. There's no reference in any of his statements to narcotics. I understand the concern about reference to snitch, but snitches can also provide false information. It doesn't necessarily – he's saying that this snitch told the truth. He's just saying someone ratted us out, rightly or wrongly. At the end of the day, if we step back, I just want to emphasize – I think it's important that when he took the stand, he didn't say anything like, oh, well, when I said we were ratted out, I meant that I was involved in a different crime, not this particular crime, or anything like that. He gave a very dubious answer that the jury could well find was a lie designed to divert their attention from the charge of conspiracy to commit drugs. So it's not as if we just have the statements made that they are for your client of what he said from the jailhouse. It's also the absurdity of the explanation he gave. Your Honor, I understand the point. I just would leave the court then with this final comment. It's a quote from United States v. Eisen, which is a case to government side. It says, the jury is free to draw negative inferences from untruthful witness testimony. And then it goes on to say, as long as there is affirmative testimony to supplement or corroborate those negative inferences. In our opinion, that's what's lacking here. We ask that the court reverse the conviction. Thank you, counsel. Thank you both. We'll take the case under advisement.